Argued and submitted October 9, 1998, reversed and remanded in part; otherwise affirmed April 28, both petitions for review allowed September 28, 1999 (329 Or 357)

**Kenneth BABICK,**
**Gary Moore and Jack K. Minzey, Jr.,**
**and others similarly situated,**
*Appellants,*

*v.*

**OREGON ARENA CORPORATION,**
an Oregon corporation,
*Respondent.*

(9704-02797; CA A99542)

980 P2d 1147

William B. Aitchison argued the cause for appellants. On the briefs were Megan E. Glor and Swanson, Thomas & Coon.

Gregory A. Zafiris argued the cause for respondent. With him on the brief were Thomas M. Triplett and Schwabe, Williamson & Wyatt, P.C.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

DE MUNIZ, P. J.

Linder, J., concurring in part; dissenting in part.

## DE MUNIZ, P. J.

In this wrongful discharge and intentional infliction of emotional distress case, plaintiffs appeal from a judgment dismissing their complaint and first amended complaint for "fail[ing] to state ultimate facts sufficient to constitute a claim[.]" ORCP 21 A(8). We reverse in part and affirm in part.

In reviewing a dismissal under ORCP 21 A(8), we assume the truth of all well-pleaded factual allegations and give plaintiffs the benefit of all favorable inferences that may be drawn from the facts alleged. *McGanty v. Staudenraus,* 321 Or 532, 536, 901 P2d 841 (1995); *see also* ORCP 12 (pleadings shall be liberally construed).

We begin with the material facts in plaintiffs' complaint.[1] Defendant owns the Memorial Coliseum, a large entertainment forum in Portland. Defendant hired plaintiffs to provide security and medical assistance at music concerts and other entertainment events held there. As part of their employment, plaintiffs received training from defendant to carry out their functions as security officers. That training included instruction on "radio procedures, * * * defensive tactics, the use of force, action to be taken in cases of suspected drug possession and the possession of alcohol by minors, [and] arrest protocol * * *." One night, some of those security officers were working at a music concert performed by the group known as Phish. At that concert, certain security officers arrested, or attempted to arrest, some members of the audience for engaging in assaultive behavior and illegal drug and alcohol possession. The arrests were consistent with the training they had received from defendant and were otherwise lawful under Oregon law. About a week later, defendant discharged the entire group of security officers, including those who were at the concert but did not make any arrests

---

[1] Plaintiffs filed a complaint alleging claims of wrongful discharge and intentional infliction of emotional distress. Defendant moved against that complaint. The trial court dismissed the wrongful discharge claim but gave plaintiffs leave to file an amended complaint as to their second claim for relief. Defendant also moved to dismiss that claim, and the trial court granted the motion. Thus, we take the material facts as to the wrongful discharge claim from the original complaint, and the facts concerning the intentional infliction of emotional distress claim from the first amended complaint. For purposes of simplicity, however, we refer only to a single complaint throughout this opinion.

and those who were employed as security officers at the time but did not work at that concert. Defendant fired all the security officers in retaliation for the lawful law enforcement actions of some security officers at the Phish concert.

Additionally, during the Phish concert, the arresting security officers had to defend themselves against Phish employees and others who attacked them while performing their security functions. In response, defendant publicly berated those plaintiffs and forced them to release the audience members who had been arrested. Those arrestees were violent and intoxicated, and their release threatened the safety of those plaintiffs who made arrests. After the concert, defendants announced publicly that plaintiffs' law enforcement action would be a "marketing disaster" and, as noted, fired the whole group of plaintiffs for that action.

Plaintiffs filed claims for wrongful discharge and intentional infliction of emotional distress. On defendant's motion, the trial court dismissed plaintiffs' complaint in its entirety. This appeal followed.

Plaintiffs' first assignment of error concerns the wrongful discharge claim of the arresting security officers. Plaintiffs argue that the trial court erred in dismissing that claim because, although plaintiffs were at-will employees, their termination for lawfully arresting concert goers falls within the public duty or societal obligation exception to the at-will employment rule.

Normally, in the absence of a contractual, statutory or constitutional requirement to the contrary, an at-will employee may quit or be fired for any reason, rational or otherwise. *Banaitis v. Mitsubishi Bank, Ltd.*, 129 Or App 371, 376, 879 P2d 1288 (1994), *rev dismissed* 321 Or 511 (1995). The Supreme Court has established a narrow exception to that general rule, holding that an employee may not be discharged for reasons that contravene public policy. *See Nees v. Hocks*, 272 Or 210, 218, 536 P2d 512 (1975) ("We conclude that there can be circumstances in which an employer discharges an employee for such a socially undesirable motive that the employer must respond in damages[.]"). Oregon courts generally have allowed such "public policy" tort actions in two situations: (1) when an employee is fired

for performing an important public duty or societal obligation[2] and (2) when an employee is fired for exercising private statutory rights that relate to the employment and that reflect an important public policy.[3] *Delaney*, 297 Or at 14-16; *Carlson v. Crater Lake Lumber Co.*, 103 Or App 190, 193, 796 P2d 1216 (1990). However, the availability of a common-law remedy is conditioned on the absence of adequate statutory remedies. *Anderson*, 131 Or App at 734. Thus, if an existing statutory remedy adequately protects the employment-related right, such a remedy precludes an otherwise sufficient common-law wrongful discharge claim. *Id.*

 Determining whether a public duty exists is a question of law. That determination requires that we *find* a public duty, not create one, using "constitutional and statutory[f]provisions or the case law of this or other jurisdictions." *Banaitis*, 129 Or App at 377-78. Further, it is not necessary that a statute specifically obligate an employee to act in the way that precipitated the discharge. *Id.* at 377, 380. Rather, a public duty may arise from evidence of a "substantial public policy that would * * * be 'thwarted' if an employer were allowed to discharge its employee without liability." *Id.* (internal citation omitted); *see also Nees*, 272 Or at 219. Consequently, the determination that a public duty exists does not create an affirmative duty to act but merely acknowledges that society encourages certain activity.

Plaintiffs argue that the public duty involved here arises from the public policy of providing "a secure concert forum through a private security force." According to plaintiffs, that policy includes the prevention and deterrence of

---

[2] *See, e.g., Nees*, 272 Or at 216-19 (serving on a jury); *Delaney v. Taco Time Int'l.*, 297 Or 10, 16, 681 P2d 114 (1984) (refusing to sign a false and potentially defamatory statement about a coworker); *Dalby v. Sisters of Providence*, 125 Or App 149, 153, 865 P2d 391 (1993) (insisting that pharmacy employer comply with administrative rules governing drug inventory and record-keeping requirements); *Banaitis*, 129 Or App at 376-80 (refusing to disclose confidential customer financial information); *Anderson v. Evergreen International Airlines, Inc.*, 131 Or App 726, 733-34, 886 P2d 1068 (1994), *rev den* 320 Or 749 (1995) (refusing to violate Federal Aviation Administration safety regulations).

[3] *See, e.g., Holien v. Sears, Roebuck and Co.*, 298 Or 76, 90-97, 689 P2d 1292 (1984) (resisting sexual harassment by a supervisor); *Brown v. Transcon Lines*, 284 Or 597, 603, 588 P2d 1087 (1978) (filing a claim for workers' compensation benefits).

crime and, as evidence of that policy, they point to the Oregon Constitution and to a host of criminal laws and other statutes that regulate security officers. Defendant contends that the actual policy involved is the "private *enforcement* of the criminal laws through making arrests," which, according to defendant, is discouraged as a matter of public policy. (Emphasis defendant's.) Defendant contends that public policy discourages arrests by private citizens because ORS 133.225 limits such arrests to "crimes committed in the presence of the private person" and with probable cause, whereas ORS 133.220 and ORS 133.310 grant a peace officer much broader authority to arrest. For the reasons that follow, we agree with plaintiffs.

It is beyond question that Oregonians value an orderly and safe community; and, as a matter of public policy, encourage the preservation of public order through the enforcement of criminal laws. *See* Or Const, Art I, § 15 (directing that criminal laws must, in part, be founded on the principle of "protection of society"); ORS chapters 131 to 170 (the Oregon Penal Code). Peace officers[4] are statutorily authorized to enforce the criminal laws, ORS 133.220(1) and (2), and generally are the persons who make arrests. However, the legislature also has extended explicit arrest authority to private citizens, including authority for the use of justifiable force. ORS 133.220(3); ORS 133.225(2). In empowering private citizens to make arrests, the public has tacitly recognized that peace officers may not be present in every situation where criminal laws are broken and has demonstrated a common concern for law enforcement in such situations.

Other statutes, as they relate to the circumstances here, further define the public policy involved. As pleaded by plaintiffs, defendant hired and trained plaintiffs solely to maintain order at a large, public music concert and, if necessary, to make arrests to effectuate that purpose. In such large

---

[4] ORS 133.005(3) defines "peace officer" as:

"a member of the Oregon State Police or a sheriff, constable, marshal, municipal police officer, investigator of a district attorney's office * * * or an investigator for the Criminal Justice Division of the Department of Justice of the State of Oregon."

public gatherings, the potential for public disorder is increased. Further, it is reasonable to infer from defendant's hiring of plaintiffs that peace officers would not be present or not be present in sufficient numbers at the concert to ensure the preservation of public order. In those circumstances, Oregonians have expressed a common concern for reliable and effective private law enforcement, as demonstrated by ORS 181.870 through ORS 181.991, which regulate the licensing and training of persons who provide security services at such "public activities."[5] *See also* OAR 259-060-0005 ("The objectives of [these private security providers rules] are to * * * rais[e] the level of competence of private security personnel[.]").

■ It is apparent from the above laws that Oregonians value an orderly and safe community. The importance of maintaining that condition is reflected in laws criminalizing disruptive behavior and in laws giving private citizens the power to arrest. That public concern is heightened in large public gatherings, where the potential for social disorder is increased and where police officers might not necessarily be present. In those circumstances, Oregonians have shown a common concern for reliable protection by citizen officers and value the order that derives from such law enforcement functions. Thus, we hold that, because plaintiffs were discharged for taking steps to maintain order at a large, public event, plaintiffs' discharge thwarted the important public policy of preserving order at such an event, where social disorder might occur and where police officers might not be present or not be present in sufficient numbers to ensure public order on their own.

---

[5] Specifically, ORS 181.870(4)(f) defines "contract security services" as the

"maintenance of order and safety at athletic, entertainment or other public activities."

ORS 181.870(12) defines "proprietary security services" as

"performance of at least one of the activities listed in subsection (4) of this section if the person performing the activity:

"* * * * *

"(d) Has as one of the person's primary purposes taking enforcement action by detaining persons or placing persons under arrest under ORS 133.225."

Notwithstanding, defendant and the dissent rely on the substance of this employment relationship—*i.e.*, that plaintiffs were hired as security officers—in arguing that the "public duty" exception to the employment-at-will doctrine does not apply here. Defendant argues that, at its core, this case turns on whether "an employer may decide against having its own employees perform [law enforcement] services on its property[,]" relying on concerns of vicarious liability as support for its point. The dissent asserts similarly:

> "Significantly, the only authority that plaintiffs had at defendant's premises and over the persons on the premises stemmed from the fact that defendant hired them to be there. * * * Defendant terminated plaintiffs' employment, in effect, because plaintiffs were providing more 'law enforcement' than defendant or defendant's patrons wanted. In other words, defendant regarded plaintiffs' performance of the parties' private agreement to be unsatisfactory.
>
> "* * * * *
>
> "The majority's holding creates a significant dilemma for private employers." 160 Or App at 152-53.

Underlying those arguments is the premise that defendant's discharge decision was based on plaintiffs' unsatisfactory job performance, not on the exercise of a public duty, and therefore was within the at-will employment rule. We disagree with that premise for the following reasons.

First, plaintiffs' complaint alleges only that plaintiffs were discharged for arresting concert goers in a manner that was lawful and consistent with the training they had received from defendant. There is no fact pleaded, nor is there any favorable inference that reasonably may be drawn from those facts, to suggest that plaintiffs performed their job duties unsatisfactorily.[6] To assert, as does the dissent, that

---

[6] In an attempt to clarify its position, the dissent states that it agrees "with the majority that nothing in the complaint lends itself to the inference that plaintiffs' performance of their services was deficient." 160 Or App at 152 n 1. Notwithstanding, the dissent goes on to conclude that what it meant to convey was that defendant's act of discharging plaintiffs demonstrated defendant's dissatisfaction with plaintiffs' performance. With respect, that conclusion still may be reached only through improper inference, but also, and in a more general sense, begs the question at the core of this issue: Why were plaintiffs discharged? The dissent's general

"defendant regarded plaintiff's performance * * * to be unsat-isfactory[,]" 160 Or App at 152, is to give defendant, not plaintiffs, the benefit of an inference that, though perhaps reasonable, nevertheless under the circumstances here con-travenes the rules governing our review of dismissals under ORCP 21 A(8). *McGanty*, 321 Or at 536. At this procedural juncture, we can only assume what the pleadings, and the favorable inferences that flow reasonably from the pleaded facts, assert: Defendant fired plaintiffs solely in retaliation for preserving public safety and order at a large, public music concert where police officers might not be present or not be present in sufficient numbers to maintain public order. That factual assertion squarely implicates the public policy iden-tified above.

In a related sense, the dissent also asserts that our holding "at least suggests that a private employee is free to disregard an employer's directions not to take law enforce-ment action because private citizens have a 'public duty' to enforce the law whenever and wherever possible." 160 Or App at 154. The dissent is wrong. Underlying the dissent's assertion is a presumption that plaintiffs here were disre-garding defendant's directions not to take law enforcement action; yet, as indicated above, that presumption is not only absent from the pleading but also, as a matter of inference, is beyond our reach given the relevant standard of review. Moreover, contrary to the dissent's position, our holding does not stand for such a broad public duty. As noted, in looking to the relevant "constitutional and statutory provisions[,]" *Banaitis*, 129 Or App at 377-78, we have found the important (and specific) public policy of preserving public safety and order to exist within the context of a large public music con-cert where peace officers might not be present or not be pres-ent in sufficient numbers to maintain public order on their own. The public duty that follows from that policy is very dif-ferent from the dissent's characterization that "private citi-zens have a 'public duty' to enforce the laws whenever and wherever possible." 160 Or App at 154.

---

response—that defendant was dissatisfied with plaintiffs' job performance— misses the point. It is the reason behind the discharge, which is found in the plead-ing, that answers that essential question.

Finally, as to concerns of vicarious liability, we note simply that, although an analysis of those concerns may be necessary in some cases, this is not one of them. *See, e.g. Gardner v. Loomis Armored Inc.*, 128 Wash 2d 931, 913 P2d 377 (1996) (applying a four-part test to a wrongful discharge claim, the last element analyzing whether the employer has an overriding justification for the dismissal). Given our standard of review, we reiterate that the pleading contains no facts, and we cannot reasonably infer, that plaintiffs violated any work rule or other work-related policy of defendant or that plaintiffs carried out their duties as security officers in an overzealous manner, which might implicate concerns of vicarious liability. Rather, plaintiffs' complaint alleges only that plaintiffs were discharged for *lawfully* arresting concert goers.

Plaintiffs' complaint stated a claim for wrongful discharge under the public duty or societal obligation exception to the at-will employment rule. The trial court erred in dismissing the claim.

■■ Plaintiffs' second assignment of error concerns the wrongful discharge claim of the security officers who were present, but did not make arrests at the Phish concert, and those who were not present at that concert but who were employed as security officers at that time. Plaintiffs contend that the trial court erred in dismissing the wrongful discharge claims of those security officers because they were charged with upholding the law and were fired for that reason, which, according to plaintiffs, contravenes the public policy described above. However, the problem with plaintiffs' argument is that their complaint alleges that defendant fired those security officers for their *association* with those plaintiffs who made arrests, not for making arrests or for being hired to make arrests. A wrongful discharge claim is not a remedy for discharges based on an employee's association with another employee. *See Carlson*, 103 Or at 196 (holding that the plaintiffs who were discharged in retaliation for their association with the plaintiff who had a viable wrongful discharge claim "d[id] not have claims for wrongful discharge[ ]"). The trial court did not err.

■ Plaintiffs' final assignment of error concerns the intentional infliction of emotional distress claim of the security officers who were present at the Phish concert. Plaintiffs contend that the trial court erred in dismissing that claim. Plaintiffs' complaint alleged that defendant publicly berated and humiliated them and unjustifiably interfered with their job duties after some plaintiffs made lawful arrests and that defendant did so with the intent "to inflict severe emotional distress on plaintiffs." The dispositive issue is whether plaintiffs' complaint sufficiently alleged conduct that "constituted an extraordinary transgression of the bounds of socially tolerable conduct." *See McGanty*, 321 Or at 543 (internal citation omitted) (listing that element as the third element of a claim for intentional infliction of severe emotional distress). That determination is a question of law.

Here, plaintiffs' allegations are claims of unjustified interference with plaintiffs' job duties, reprimands and public humiliation. In *Snyder v. Sunshine Dairy*, 87 Or App 215, 217-18, 742 P2d 57 (1987), we addressed similar allegations and held that such claims did not amount to an "extraordinary transgression of the bounds of socially tolerable conduct." Nevertheless, plaintiffs argue that this case is distinguishable from *Snyder* because here plaintiffs alleged also that defendant "present[ed] a threat of imminent physical harm to plaintiffs." That danger related to the release of "intoxicated and violent" arrestees. Plaintiffs are correct that that kind of allegation is absent from the allegations in *Snyder, see* 87 Or App at 217 n 1 (listing allegations), and that the additional claim of imminent danger makes defendant's conduct socially intolerable.

The "means" a defendant uses to inflict the emotional distress must be particularly offensive. *Madani v. Kendall Ford, Inc.*, 312 Or 198, 204-05, 818 P2d 930 (1991). Here, defendant's method of reprimand included conduct that subjected plaintiffs to the threat of *imminent* physical injury. Intentional conduct that exposes a person to imminent harm is intolerably abusive. However, because it is the imminent aspect of plaintiffs' claim that makes it actionable, only those security officers who made arrests, and therefore actually faced the alleged danger, may assert the claim. The

trial court erred in dismissing the claim as to the arresting plaintiffs.

Reversed and remanded as to the wrongful discharge and intentional infliction of emotional distress claims of plaintiffs who made arrests; otherwise affirmed.

**LINDER, J.,** concurring in part; dissenting in part.

The majority holds that at least those plaintiffs who actively participated in making arrests and in related activities may pursue their wrongful discharge claims because, notwithstanding that those activities were what defendant hired plaintiffs to perform and that plaintiffs performed them more vigilantly than defendant apparently wanted, plaintiffs were engaged in and were fired for advancing the important public duty of crime prevention and public safety. The majority explains further:

> "Other statutes, as they relate to the circumstances here, further define the public policy involved. As pleaded by plaintiffs, defendant hired and trained plaintiffs solely to maintain order at a large, public music concert and, if necessary, to make arrests to effectuate that purpose. In such large public gatherings, the potential for public disorder is increased. Further, it is reasonable to infer from defendant's hiring of plaintiffs that peace officers would not be present or not be present in sufficient numbers at the concert to ensure the preservation of public order. In those circumstances, Oregonians have expressed a common concern for reliable and effective private law enforcement, as demonstrated by ORS 181.870 through ORS 181.991, which regulate the licensing and training of persons who provide security services at such 'public activities.' *See also* OAR 259-060-0005 ('The objectives of [these private security providers rules] are to * * * rais[e] the level of competence of private security personnel.')." 160 Or App at 145-46 (footnote omitted).

With respect, I find the majority's reasoning to be circular. The reason the majority concludes that plaintiffs' employment contract with defendant does not fall into the usual "at-will" situation, and that it entails a public duty related to law enforcement, is that defendant contracted with plaintiffs to perform law enforcement-related duties. It

would appear that plaintiffs and defendant had a very different view of how plaintiffs were to perform those duties but, nevertheless, the employment contract was one through which plaintiffs were to perform standard private security services on defendant's behalf.

I agree with the majority that law enforcement, public safety and order and the like are matters of great public concern. In my view, however, the vindication of that concern is primarily entrusted to the public authorities. To be sure, as the majority indicates, private citizens—such as plaintiffs—have certain law enforcement authority under certain circumstances. Additionally, when private citizens hold themselves out as being in the business of providing security services—as plaintiffs apparently do—the majority is again right in observing that they are subject to state regulation and, to some extent, their involvement may reduce the need for and provide some of the services that would otherwise require an actual police presence.

While all of that is true, plaintiffs are *not* the police. They were people who were hired to perform services for defendant that, in some particulars, might resemble the law enforcement and public safety functions that the police provide. Significantly, the only authority that plaintiffs had at defendant's premises and over the persons on the premises stemmed from the fact that defendant hired them to be there. That is, plaintiffs were there, doing what they were doing, pursuant to their private contract of employment. Defendant terminated plaintiffs' employment, in effect, because plaintiffs were providing more "law enforcement" than defendant or defendant's patrons wanted. In other words, defendant regarded plaintiffs' performance of the parties' private agreement to be unsatisfactory.[1]

The majority's crucial premise is that, because plaintiffs were hired to provide services that come within the

---

[1] I agree with the majority that nothing in the complaint lends itself to the inference that plaintiffs' performance of their services was deficient. *See* 160 Or App at 9 n 6. However, the majority is incorrect in understanding my statement to mean that plaintiffs' performance was *in fact* unsatisfactory. My intended meaning is simply that, rightly or wrongly and for good reasons or bad, defendant was sufficiently unsatisfied with their performance to terminate the at-will relationship.

ambit of "law enforcement" as most broadly defined, their services in furtherance of their contract with defendant simultaneously discharged a public duty that is functionally indistinguishable in its nature and scope from the one that is principally entrusted to and fulfilled by public peace officers. I disagree with that premise. At the margins, the line between the police and private citizens who perform police functions perhaps can become murky. However, this case is not close to the margins. This is not a case where a private security officer was fired for arresting the boss's son, any more than it is a case where a police officer was fired for giving the mayor's son a speeding ticket. Nor is this a case where the situation that confronted plaintiffs escalated from the ranges of anticipated disorder into a out-of-control mob scene that required immediate action equivalent in its dimensions to a police crowd control operation.

Instead, what was involved here was simply that plaintiffs were hired by defendant as private security officers and, apparently, did something akin to what they understood was expected of them. That they were fired for doing so might have been the predicate for a breach of contract action, were it not for the fact that they were subject to termination without cause. However, they have no cause of action based on any theory that they were, by agreement or in fact, performing a role equivalent to that of police officers. Insofar as the majority means to say that there is a public duty or societal obligation for citizens generally or private security personnel specifically to perform—or to be allowed to perform—non-crisis law enforcement activities of the kind that the police themselves might have chosen to conduct under these circumstances, I do not agree.

The majority's holding creates a significant dilemma for private employers. An employer is liable for the torts of its employees committed in the course and scope of the employment relationship. *Chesterman v. Barmon*, 305 Or 439, 442, 753 P2d 404 (1988). Law enforcement-type activities can be a source of substantial tort exposure, involving, as they do, an often delicate balance between maintaining public order and respecting individual civil liberties. An employee who overzealously or otherwise crosses the line between permissible

law enforcement and an infringement of civil rights can create significant liability—even punitive in nature—for an employer. *See, e.g., Blume v. Fred Meyer, Inc.*, 155 Or App 102, 936 P2d 700 (1998) (affirming verdict against retail store imposing compensatory damages of $25,000 and punitive damages of $450,000 for employee's false arrest of store customer). For that and other legitimate reasons, an employer may decide to limit the authorization for employees to respond to suspected violations of the law (which can encompass potential acts of theft, trespass, harassment, and underage alcohol use, to identify only a few).

The majority's holding at least suggests that a private employee is free to disregard an employer's directions not to take law enforcement action because private citizens have a "public duty" to enforce the laws whenever and wherever possible. Alternatively, if the majority's answer to that dilemma would be to say that the analysis turns on whether the employee was hired as a private security person and whether the employer adequately directed the employee not to take certain law enforcement action, then the majority is conceding that the scope of the duty is defined by the employment contract. The fact is, the majority cannot have it both ways. There either is a public duty for these private citizens to enforce the criminal laws that exists apart from their employment contract, or there is not. If there is, an employer is not free to discharge an employee for disregarding the employer's directions on whether and when to perform that public duty, or for otherwise not performing to the employer's satisfaction. If, on the other hand, a duty to take law enforcement action exists only because the employee was hired as a private security person and at least arguably was authorized to take certain actions, then a discharge for engaging in those actions should be the source of a contract claim only.

In dissenting from the majority on this point, there are two things I wish to emphasize. First, I do not find the various analogies that the parties advance to be particularly analogous, and I therefore want to make clear that I am saying nothing about situations that differ from this one and that *might* come within the analogies. For example, plaintiffs imply that Oregon has a heritage of the citizenry aiding the constabulary in the protection of the public safety and the

enforcement of the criminal law. However, this is not a case involving a nineteenth century posse or any twentieth century analog that it may have. This is a case about plaintiffs who accepted employment for profit to provide security services on defendant's private property and who did not perform that employment to defendant's expectations—however unadmirable those expectations may have been.

Second, this opinion in no way suggests that the maintenance of order, the arrest of offenders and the like are not matters of public importance. Rather, my point is that the *private* performance of those functions under the circumstances here does not give rise to a "public duty," within the meaning of the wrongful discharge cases, that affects the terms or the terminability of this contract between these parties.

For those reasons, I dissent from the majority's decision insofar as it reverses any of the wrongful discharge claims. Because I view the intentional infliction of emotional distress claims as inseparable from the wrongful discharge claims, I also dissent from the majority's reversal of the dismissal of those claims. I agree with the majority's affirmance of the trial court's rulings dismissing the claims of the "nonparticipating" plaintiffs.

Accordingly, I respectfully dissent, in part, and concur, in part.